THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHRISTOPHER MANNING, Defendant-Appellant.

Fifth District   No. 76-394

Opinion filed May 19, 1978.

Michael J. Rosborough and John H. Reid, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Bruce D. Irish and Martin N. Ashley, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

In a jury trial in the Circuit Court of St. Clair County, Christopher Manning was convicted of armed robbery and sentenced to the penitentiary for a term of five to 15 years. On appeal, he assigns as error the denial of a jury determination of the restoration of his fitness to stand trial; the exclusion of certain testimony on the issue of his sanity; the

denial of the effective assistance of counsel; and the severity of his sentence. We need only consider the first two issues.

Defendant was first tried and convicted after a jury trial on February 18, 1975, after being adjudged fit to stand trial after a competency hearing before the court. Prior to trial, a hearing was held on defendant's motion to suppress his confession. The trial court suppressed the confession on belief that defendant was unable, because of low intelligence, to understand the *Miranda* warnings.

After conviction, the defendant requested another competency hearing to determine whether he had been fit to stand trial or was fit to be sentenced. Dr. Robert Deitchman, a psychiatrist licensed in Missouri but not Illinois, examined Manning and reviewed his medical history. Dr. Deitchman reported that as the result of being struck by an automobile at age five, Manning had suffered a crushed skull and had lost 50 to 60 grams of cortex brain tissue, requiring the implantation of a plate in his head. Dr. Deitchman's conclusion was that Manning "should be adjudged" incompetent. Based on Dr. Deitchman's testimony, the trial court vacated the verdict and adjudged Manning incompetent to stand trial and in need of medical treatment. The court did not limit its finding to defendant's fitness to be sentenced. (*Cf. People v. Pierce*, 50 Ill. App. 3d 525, 365 N.E.2d 988 (1st Dist. 1977).) The defendant was committed to the Illinois Department of Mental Health.

On September 3, 1975, a hearing was held in Randolph County at which it was determined that Manning was not in need of treatment and he was ordered released to the sheriff of St. Clair County. The trial court then ordered additional psychiatric examinations of defendant in preparation for his pending trial.

Because the first trial had proceeded to verdict, and the request for an additional fitness hearing had been requested after the commencement of the trial, the trial court denied the defendant's motion for a jury hearing to determine if Manning's fitness had been restored. The restoration hearing was held on February 4, 1976, without a jury. The State called Dr. Clifford Gilpin, who testified that Manning was competent to stand trial despite his low I.Q. The defendant called the principal and assistant principal of Manning's junior high school, both of whom testified that Manning, when in school, had presented a difficult discipline problem.

Also testifying for the defense was Cheryl Shimkus, the court psychologist. She spoke of the tests she had administered to the defendant. She testified that his I.Q. as measured by the Stanford-Binet Intelligence test was 49, and that his mental age was eight years and six months. Her conclusion was that Manning would have great difficulty assisting his counsel and was incapable of understanding the proceedings.

The court also received into evidence a deposition of Dr. Deitchman in

which the psychiatrist reiterated his opinion that Manning was not fit to stand trial and needed custodial care. The trial court adjudged Manning fit to stand trial.

The second trial began March 10, 1976, with the State presenting evidence that defendant had entered an East St. Louis dry cleaning store on a Saturday morning, armed with a gun, and robbed the two women behind the counter. Another State's witness, who knew Manning, placed him at the scene immediately before the robbery.

The defendant presented an insanity defense. He called Leroy Howell and Phillip Beck, principal and assistant principal of defendant's junior high school, both of whom spoke of Manning's discipline problems. Howell testified that Manning was an "under achiever" who had been on waiting lists for special education classes. Beck testified that Manning seemed to him incapable of distinguishing conduct which is within the law from that which is not. Beck also stated that he did not believe that Manning could have improved in this respect in the time between his departure from junior high school and the offense.

The prosecutor then made a motion *in limine* to exclude the deposition of Dr. Deitchman which the defense intended to introduce. The grounds for this motion were that the deposition referred only to fitness, not sanity, that the prosecutor had not attended the deposition because the defense attorney told him that its only purpose was to determine defendant's competency, and that because Dr. Deitchman was not listed as a possible defense witness the State had not secured the attendance of its expert witnesses, namely, three psychiatrists who had found defendant not only fit, but sane. In response to defense counsel's claimed surprise that the deposition might not be admitted, the prosecutor reminded her that he had told her several times that he believed it would be inadmissible. Defense counsel stated that she had not secured Dr. Deitchman's presence at trial because she had believed that his deposition would be admissible.

The trial court sustained the motion and declined to grant a continuance that afternoon for the purpose of allowing the defense to obtain Dr. Deitchman's deposition concerning Manning's sanity. The trial court also denied defense counsel's offer of proof that Dr. Deitchman would have testified that in his opinion the defendant was legally insane.

The prosecutor also objected to permitting court psychologist Cheryl Skimkus to testify because she had not attained a Ph.D. in psychology. The trial court indicated that her testimony would be inadmissible unless her tests formed the basis for a psychiatrist's opinion as to the defendant's sanity. Defense counsel replied that inasmuch as the defendant was arguing that insanity was caused by a low I.Q., Skimkus would not be asked her opinion of Manning's sanity. In an offer of proof, the defense counsel stated that Cheryl Skimkus held a master's degree in psychology

and had been a court psychologist for five years. She further stated that Skimkus would testify that according to the Wechsler test the defendant's I.Q. was 68, that according to the Stanford-Binet test his I.Q. was 46, and that his reading ability was that of one in the second grade. The trial court refused to allow Cheryl Skimkus to testify.

The trial court also refused the defense's tendered insanity instruction. Then, on the State's motion, the trial court struck the testimony of Leroy Howell and Phillip Beck as being insufficient to raise the issue of insanity and otherwise immaterial. The jury was instructed to disregard the testimony of Howell and Beck.

At the sentencing hearing, the prosecutor noted that as Manning had no criminal record and that the offense involved no aggravating circumstances, he recommended the minimum sentence. The trial court, however, imposed a penitentiary sentence of five to 15 years.

Defendant's first contention is that the denial of his request for a jury at the February 4, 1976, restoration hearing is reversible error. We agree.

There is no constitutional right to a jury at a fitness or restoration hearing; it is a question of procedure which is governed solely by statute. (*People v. Shadowens*, 44 Ill. 2d 70, 72, 254 N.E.2d 484, 485 (1969); *People v. Brown*, 43 Ill. 2d 79, 81, 250 N.E.2d 647, 649 (1969).) Fitness to stand trial is thus governed by the Unified Code of Corrections, specifically section 5—2—1 (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1):

> "(d) When the question of the defendant's fitness to stand trial is raised prior to the commencement of trial, the question shall be determined by the court, or by a jury. The defendant or the State may request a jury or the judge may on his own motion order a jury. Where the question is raised after commencement of the trial, the question shall be determined by the court."

The procedure for disposition of a defendant already found unfit is stated in section 5—2—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2):

> "(b) A defendant hospitalized under this Section shall be returned to the court not more than 90 days after the court's original finding of unfitness, and each 12 months thereafter. At such re-examination the court may proceed, find, and order as in the first instance under paragraph (a) of this Section. If the court finds that defendant continues to be unfit to stand trial or be sentenced but that he no longer requires hospitalization, the defendant shall be released under paragraph (a) of this Section on bail or recognizance. Either the State or the defendant may at any time petition the court for review of the defendant's fitness."

Paragraph (a) of section 5—2—2 does not refer to the procedure for the redetermination of a defendant's fitness (see *People v. Davis*, 25 Ill. App. 3d 1007, 324 N.E.2d 58 (5th Dist. 1975)). Rather, it provides for a hearing

according to the provisions of the Mental Health Code of 1967 (Ill. Rev. Stat. 1975, ch. 91½, pars. 1—1 *et seq.*) to determine whether a defendant who has already been adjudged unfit should be hospitalized; this was resolved at a nonjury hearing in the Circuit Court of Randolph County when defendant was found not in need of mental treatment.

To add further to the confusion, the Council Commentary following section 5—2—2 states that "[s]ubsequent re-examination hearings were intended to be heard by the court without a jury even if the original determination of unfitness was made by a jury." (Ill. Ann. Stat., ch. 38, par. 1005—2—2, Council Commentary, at 258 (Smith-Hurd 1975).) Nevertheless, dicta in two recent cases have asserted that a defendant, pursuant to section 5—2—2, is entitled to a jury at a restoration hearing if he so elects. *People v. Welsh,* 30 Ill. App. 3d 887, 333 N.E.2d 572 (2d Dist. 1975); *People v. Duhr,* 27 Ill. App. 3d 651, 327 N.E.2d 267 (5th Dist. 1975).

Section 5—2—2, which is applicable to the present case, is silent as to the procedure to be followed in redetermining a defendant's fitness. The Council Commentary, although it offers an interpretation of the drafters' intent, is not persuasive because it is not construing an ambiguity but rather presuming to fill a void.

The reference of the Council Commentary is not clear. Does it refer to a hearing under the Mental Health Code (Ill. Rev. Stat. 1975, ch. 91½, par. 1—1 *et seq.*) to determine a defendant's need or continued need for hospitalization or does it refer to a hearing to determine if a defendant's fitness has been restored, or put otherwise, a redetermination of defendant's fitness under section 5—2—1? The Code does not speak of "restoration" of fitness in either section 5—2—1 or 5—2—2, which would indicate that the General Assembly intended that any determination of fitness be under section 5—2—1(d) and that either the State or defendant could request a jury. On the other hand, the reference in the Council Commentary could hardly refer to proceedings under the Mental Health Code as article IX of the Code (Ill. Rev. Stat. 1975, ch. 91½, par. 9—1 *et seq.*), governing court hearings, affords the patient the right to have his need for mental treatment determined by a jury of six persons as provided in section 9—2.

Note also that section 5—2—1(d) says that the State or defendant may *request* a jury determination of fitness. Does *request* mean *demand* or is the matter to be left to the discretion of the court?

Prior to 1973, the date of adoption of the present sections 5—2—1 and 5—2—2 of the Unified Code of Corrections, *People ex rel. Suddeth v. Rednour,* 33 Ill. 2d 278, 211 N.E.2d 281 (1965), construed section 104—2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1963, ch. 38, par. 104—2) as extending an absolute right to a jury determination of fitness to a defendant unless waived. It would seem that the only change intended by the language of sections 5—2—1 and 5—2—2 was to afford

defendant a right to a jury determination of fitness at his affirmative election and not upon express waiver.

■■ This is the view expressed in *People v. Duhr*, 27 Ill. App. 3d 651, 327 N.E.2d 267 (5th Dist. 1975), and *People v. Welsh*, 30 Ill. App. 3d 887, 333 N.E. 572 (2d Dist. 1975), and suggested in *People v. Pierce*, 50 Ill. App. 3d 525, 365 N.E.2d 988 (1st Dist. 1977). Whether the hearing is an initial hearing, or is denominated a restoration hearing or a redetermination of fitness, we hold that before trial a defendant may demand a jury determination of fitness under section 5—2—1(d) and accordingly the court erred in denying defendant a jury hearing on February 4, 1976.

We will consider the exclusion of certain testimony touching on defendant's sanity as this question may arise upon retrial. The defendant contends that the trial court erred in granting the State's motion *in limine* which prohibited Cheryl Skimkus from testifying as an expert witness. Skimkus holds a master's degree in psychology and has worked for about five years as the court psychologist. Defendant's brief notwithstanding, these qualifications are not sufficient for certification under the Mental Health Code (Ill. Rev. Stat. 1975, ch. 91½, par. 410). Defense counsel's offer of proof indicated that Skimkus would have testified about abnormally low scores which Manning achieved on intelligence-measuring tests which Skimkus administered. On the Wechsler Adult Intelligence Scale, administered in 1974, his I.Q. measured 68. On the Stanford-Binet test, which is designed to measure the extreme ranges of intelligence, his I.Q. score was 46. The Stanford-Binet test was administered in early 1976.

The resolution of this issue depends upon a line of cases beginning with *People v. Noble*, 42 Ill. 2d 425, 248 N.E.2d 96 (1969). In *Noble* the psychologist who was not permitted to testify, Dr. Gurstein, was a Ph.D. from the University of Chicago. He had spent one year as a post-doctoral intern in psychology at Billings Hospital and three years at the University of Michigan where he taught several courses. Dr. Gurstein had since been employed as an assistant professor of psychology in the department of psychiatry at the University of Illinois and had been appointed director of clinical training in psychology in that department. Dr. Gurstein was also a registered psychologist pursuant to the Mental Health Code (Ill. Rev. Stat. 1975, ch. 91½, par. 410), which requires for certification a doctoral degree and two years of experience. Dr. Gurstein testified that he administered several psychological tests on the defendant at the request of Dr. Israel, a psychiatrist employed by the defendant. The trial court allowed Dr. Gurstein to identify the tests but refused to permit him to give the tests' results. Additionally, Dr. Israel was prohibited from stating the tests' results or considering them in forming his opinion of the defendant's sanity.

■■■ Our supreme court held that inasmuch as the tests were requested

by a psychiatrist, the psychologist's qualifications were apparent, and the psychologist met the statutory requirements to be certified in Illinois, Dr. Gurstein should have been permitted to testify as to the nature of the tests, the procedures which he followed in their administration, and the results thereof. (*People v. Noble*, 42 Ill. 2d 425, 436, 248 N.E.2d 96, 102.) Subsequent cases have interpreted *Noble* to stand for two propositions. First, the testimony of a psychologist as to the tests he performed and the results thereof is irrelevant unless it forms the basis for a psychiatrist's opinion of the defendant's sanity. (*People v. Gilliam*, 16 Ill. App. 3d 659, 664, 306 N.E.2d 352, 356 (3d Dist. 1974).) Second, the psychologist must presumably possess credentials of a quality comparable to those of Dr. Gurstein in *Noble*. (*In re Wellington*, 34 Ill. App. 3d 515, 518-19, 340 N.E.2d 31, 34 (1st Dist. 1975) (civil commitment).) We have found no case in which a psychologist not meeting the statutory standards for certification was properly permitted to testify.

At trial, defense counsel urged the court to distinguish her theory of insanity, abnormally low intelligence, from what she called "aberational" insanity. She asserted that a psychologist is specifically trained to administer intelligence tests while psychiatrists are not so trained but rather rely on psychological testing to form the basis of their opinions. She cites *People v. Turner*, 56 Ill. 2d 201, 306 N.E.2d 27 (1973), for the proposition that low intelligence alone can form a legally sufficient basis for insanity.

Although these arguments have a surface plausibility, we must disagree. Whether *Turner* is applicable to this case, if evidence of the defendant's low intelligence were fully developed at trial, is irrelevant to the issue before us. The present issue relates to the proper manner of presenting evidence of abnormally low intelligence, not whether there is sufficient proper evidence to justify instructing the jury on insanity. Furthermore, the fact that a clinical psychologist testified, without objection, in *Turner*, does not, as defendant implies, put the supreme court's imprimatur on this practice. We hold that inasmuch as Cheryl Skimkus did not possess a doctorate and two years experience, much less the qualifications of Dr. Gurstein, and, equally important, because no psychiatrist was testifying who would use her testimony as a foundation for his opinions, the trial court properly refused to permit her to testify as an expert witness of the tests she conducted and their results. Upon retrial her testimony could be offered if it assists proper psychiatric evidence of defendant's sanity. As there was no indication that she could have testified from her own personal knowledge of the defendant, as a lay witness, that possibility need not be discussed.

The defendant also asserts that the trial court erred in striking, at the close of defendant's case, the testimony of Leroy Howell and Phillip

Beck. The nature of the testimony of Howell and Beck, the principal and assistant principal, respectively, of defendant's junior high school, has been previously set out.

The statuory definition of insanity is stated in section 6-2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 6-2):

> "(a) A person is not criminally responsible for conduct if *at the time of such conduct*, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Emphasis added.)

■■ The rule in Illinois is clear: in order to be entitled to instruct the jury on the issue, the evidence must raise a reasonable doubt of the defendant's sanity at the time of the offense. (*People v. Smothers*, 55 Ill. 2d 172, 174, 302 N.E.2d 324, 326 (1973); *People v. Childs*, 51 Ill. 2d 247, 256, 281 N.E.2d 631, 635 (1972).) Expert testimony is unnecessary; facts observed by a lay witness can be sufficient to raise the issue. (*People v. Smothers*, 55 Ill. 2d 174, 302 N.E.2d 326; *People v. Farmer*, 50 Ill. App. 3d App. 3d 111, 365 N.E.2d 177, 181 (5th Dist. 1977).) Cases cited by the defendant, *People v. Harrington*, 22 Ill. App. 3d 938, 317 N.E.2d 161 (2d Dist. 1974), and *People v. Arnold*, 17 Ill. App. 3d 1043, 309 N.E.2d 89 (3d Dist. 1974), are inapplicable inasmuch as they examine whether the evidence was sufficient, once the issue of sanity was raised, to support the jury's verdict. In the present case, however, we must decide whether the evidence was sufficient to raise the issue of Manning's sanity. We believe it was not. Evidence of idiosyncratic behavior and irresponsibility of conduct are insufficient to warrant an insanity instruction. (*People v. McBride*, 130 Ill. App. 2d 201, 207, 264 N.E.2d 446, 450 (1st Dist. 1970).) There was no evidence that either Howell or Beck had seen the defendant since he left junior high school. Their testimony, that he was an "under achiever" and a serious discipline problem, is totally unrelated to Manning's state of mind on October 26, 1974, the date of the crime. Even Beck's opinion that the defendant could not distinguish conduct prohibited by law is unsupported by any personal observations and remote in time reference from the offense. We believe that, even including the testimony of Howell and Beck, the evidence does not raise the issue of sanity for the jury's consideration. Consequently, this testimony had no probative value and was, we believe, properly stricken.

Accordingly, the judgment of the Circuit Court of St. Clair County is reversed and remanded for a new trial in accordance with this opinion.

Reversed and remanded.

EBERSPACHER, P. J., and JONES, J., concur.