THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES MARTIN, Defendant-Appellant.

First District (5th Division)   No. 85—0951

Opinion filed February 11, 1988.

Paul P. Biebel, Public Defender, of Chicago (Vicki Rogers, Marilyn Martin, and Frank Madea, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Nancy L. Grauer, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

In a bench trial defendant Charles Martin was found guilty but mentally ill on charges of murder and aggravated arson, receiving concurrent sentences of 35 and 10 years on those convictions. The court also found that defendant's guilt as to a charge of arson had been established, but entered no finding on that charge because it merged with the aggravated arson conviction. On appeal defendant contends: (1) the trial court erred in finding that defendant had failed to establish by a preponderance of the evidence that he was legally insane at the time he committed these offenses; (2) the guilty but mentally ill statute violates the due process and equal protection clauses of the United States and Illinois Constitutions; (3) it is a violation of due process to require a defendant to bear the burden of proving his insanity; and (4) defendant's conviction for aggravated arson must be reversed because the aggravated arson statute is unconstitutional.

We affirm defendant's murder conviction, reverse his conviction for aggravated arson, and remand the cause for sentencing on the remaining arson conviction.

It is undisputed that in the early morning hours of July 5, 1984, defendant set fire to the home in which his mother and 13 other people lived. In the ensuing fire defendant's seven-year-old nephew was killed. It is also undisputed that at the time of this offense defendant had a mental illness: schizophrenia, paranoid type. The factual dispute in this case concerns whether at the time of the commission of the offense defendant was legally insane; that is, did he, as the result of a mental disease or defect, lack substantial capacity either to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct?

The evidence at trial established that defendant had been in and

out of mental institutions for 10 to 15 years. Defendant's mother testified that at the time of this incident the defendant had stopped taking the medication prescribed for his mental illness. He had been acting unusual: eating off the ground and saying that he heard voices telling him to do things to her. Defendant had been living in the basement of the two-flat building where his mother and other relatives lived. At noon on July 4 defendant's mother refused his request to use her station wagon. She testified that she did so because he had no license and her insurance did not cover him. Although she testified that he did not appear angry at this, she also testified that she asked him to leave the house because of the way he was acting and because he was not taking his medication. One of his actions was to mockingly threaten to stab her in the back with a butcher knife. At about 4 p.m. a neighbor was told by defendant that the occupants of the house made him so mad, if he had the money he would burn them down. In the early evening hours defendant was observed walking back and forth in front of the two-flat, swearing and threatening to kill the occupants by burning up the building. This behavior continued for hours. At one point he threatened to throw bricks at his mother's car, but then dropped them. At about 10 p.m. he approached some of the occupants on the porch, and after borrowing a cigarette, again told them that he would burn down the house and kill everybody. At 11:30 p.m. defendant walked to a nearby gas station and, on the pretext of having run out of gas, bought two cans of gasoline, leaving a $10 deposit for the cans. He instructed the attendant to place the caps back on the cans so that the nozzles pointed out. At about 12:30 a.m. defendant used the gasoline to set fire to his mother's car and the two-flat. He left one can on the porch and, according to a subsequent statement to the police, threw the other in the bushes. A neighbor reported seeing defendant "cut out" after setting fire to the porch. The attendant who sold defendant the gasoline saw him walking by the station and heard him tell a passerby that he had burned down the building.

When arrested and questioned shortly after the fire was set, defendant initially denied having set it, although police reported that his clothes smelled of gasoline. The officer who arrested defendant at about 1 a.m. and the detective who first questioned him both reported that defendant appeared to be behaving normally. Subsequently defendant asked to talk to the police again and admitted having set the fire. At this time defendant appeared remorseful. The assistant State's Attorney who then took his statement (at about 11:20 a.m.) testified that he seemed in complete control of his facul-

ties, was coherent, calm, responsive, and appeared normal in all respects. In his statement defendant said he set the fire because he was mad at his mother. Defendant refused to allow a court reporter to take down the statement but he did agree to allow the assistant State's Attorney to write down what he said.

Three expert witnesses testified for the defendant. Dr. Gerson Kaplan, a psychiatrist with the Psychiatric Institute of the Circuit Court of Cook County, saw the defendant on August 29, 1984, and September 28, 1984. He diagnosed defendant as having a schizophrenic disorder, paranoid type. It was his opinion that defendant was also suffering from this disorder on the day of the offense, but he had no opinion concerning defendant's sanity at the time of the offense.

Roger Thomson, a doctoral candidate in psychology, examined defendant on August 24, 1984. At that time he tentatively diagnosed defendant as a paranoid schizophrenic. He also tentatively concluded that at the time of the offense the defendant lacked the substantial capacity to conform his conduct to the requirements of the law. However, he reached no conclusion as to whether defendant could appreciate the criminality of his conduct at the time of the offense. In February 1985 Thomson obtained more information, including records of defendant's prior mental treatment and a social history of his family. This information resulted in a definitive diagnosis by Thomson of defendant as a schizophrenic, paranoid type. However, Thomson testified that his opinions concerning the two forms of insanity, as applied to defendant at the time of the offense, were unchanged. Thus it would appear that Thomson's opinion of defendant's insanity at the time of the offense remained a tentative one.

Defendant's key psychiatric witness was Dr. Michael Reinstein, who had treated the defendant from January 1982 until July 1984. In that period Dr. Reinstein had seen defendant in 60 out-patient visits as well as 7 to 10 times when defendant was hospitalized. His diagnosis was that defendant was a schizophrenic, paranoid type, chronic form. He had placed defendant on Navane, an antipsychotic drug, which was critical to the control of the illness, but he had difficulty getting defendant to take it regularly. Occasions when defendant failed to take the drug correlated with occasions when defendant got worse and had to be hospitalized. Defendant's symptoms included becoming very upset, believing people were trying to harm him, hearing threatening voices, and having to suppress ideas of trying to harm others. These symptoms were sometimes directed toward other people: his mother, sisters, or his girl friend.

Dr. Reinstein saw defendant as a patient on July 3, 1984. At that time it was his opinion that defendant still suffered from his mental illness. Defendant's condition had worsened in that he became paranoid easily, but the doctor at that time also reported that there was no real management problem with the defendant. At that time he prescribed a continuing dosage of Navane. Dr. Reinstein again saw defendant on December 11, 1984. By then he had reviewed the evaluations of Dr. Kaplan and Roger Thomson as well as the police reports concerning what had occurred and had also discussed those events with defendant's mother. It was Dr. Reinstein's opinion that at the time of the occurrence the defendant was suffering from acute exacerbation of his mental illness. His symptoms had dramatically worsened from July 3; he had become more agitated and his actions in setting fire to the car and house showed a lack of cohesion, or disorganized behavior. Other evidence of this disorganized behavior was what defendant told the doctor (on December 11) about hallucinations he experienced at the time of the occurrence. He thought his mother was the devil and that his sister was treating him unfairly. It was Dr. Reinstein's opinion that at the time of the occurrence the defendant could neither appreciate the criminality of his conduct nor substantially conform his conduct to the requirements of the law.

On cross-examination Dr. Reinstein stated that in four examinations of the defendant in June of 1984, he had found that defendant was less paranoid, felt better about himself, had no real management problems, and had expressed the need for medication compliance. On June 5 and again on June 26 Dr. Reinstein had noted that he had renewed defendant's medication. Despite his July 3 observation that defendant became paranoid easily, Dr. Reinstein did not then believe defendant required immediate hospitalization, although he had long believed that voluntary long-term hospitalization would benefit the defendant. Dr. Reinstein could not form an opinion as to whether the following actions evidenced organization or disorganization on the part of the defendant: the mock stabbing of his mother; threatening to set a fire and then carrying out that threat; instructing the gas station attendant on how to put the caps on the gasoline cans; hiding one gasoline can; fleeing the scene after the fires were set. However, upon subsequent cross-examination the doctor conceded that the mock stabbing and the threats with the bricks showed some control, which would bear on defendant's ability to conform his conduct to the requirements of law. He also conceded that when defendant confessed and expressed remorse this was evidence that he was in control at that time.

Testifying for the State, Dr. Gilbert Bogen, also a psychiatrist with the Psychiatric Institute, stated that he had examined the defendant for about one hour on October 16, 1984. He also reviewed Dr. Kaplan's reports, the psychological report, a social work service report, police reports, and the records of the Illinois Department of Mental Health. Later he reviewed Dr. Reinstein's medical history. Dr. Bogen diagnosed defendant as having a schizophrenic disorder, paranoid type, in remission with medication. (Earlier Dr. Reinstein had testified that, when seen by Dr. Bogen, the defendant was taking four times the dosage of Navane that Dr. Reinstein had prescribed for him before the occurrence.) However, it was also Dr. Bogen's opinion that defendant was sane at the time of the occurrence. As evidence that defendant could appreciate the criminality of his conduct, Dr. Bogen cited evidence that defendant fled the scene, hid one of the gas cans, and initially denied committing the offenses. As evidence that defendant was able to conform his conduct to the requirements of the law, Dr. Bogen noted that defendant's actions in threatening to stab his mother and throw bricks at her car but then restraining himself showed that he could control his behavior. He also cited defendant's ability to rent the gas cans and his instructions to the attendant on how to position the gas caps. However, on cross-examination Dr. Bogen conceded that purposive behavior, such as the defendant's actions at the gas station, could still be psychotic in nature if the actor was following delusional behavior. Dr. Bogen also stated that Dr. Reinstein's report of July 3 confirmed his opinion concerning defendant's sanity because it stated that defendant had no management problem.

OPINION

I

■ We first consider defendant's contention that the trial court erred in finding that he failed to establish that he was legally insane at the time he committed these offenses. It is well established that the issue of a defendant's insanity at the time of the offense is a question of fact and that the fact finder's resolution of that issue will not be disturbed unless it is contrary to the manifest weight of the evidence. (*People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066.) Citing *People v. Palmer* (1985), 139 Ill. App. 3d 966, 487 N.E.2d 1154, defendant asserts that we should overturn the trial court's determination because the opinion of the sole State expert was based on erroneous premises and was not credible. In *Palmer*

the sole State expert witness, while conceding that the defendant was grossly psychotic on the day of the offense, denied that defendant was then insane, contending that this was a drug-induced psychosis. He based this opinion on the defendant's past drug usage and on various physical symptoms which he conceded could also be symptoms of schizophrenia. There was no direct evidence of current drug usage by the defendant and the police who arrested him immediately after commission of the offense did not believe him to be under the influence of drugs. Two psychiatrists and a psychologist testified that he was suffering from schizophrenia and two of those experts believed the defendant to be legally insane at the time of the offense. Under these circumstances the *Palmer* court found the testimony of the State expert to be weak, self-contradictory and not credible, therefore reversing the defendant's conviction.

In this cause all four of the expert witnesses testifying at trial diagnosed defendant as suffering from schizophrenia, paranoid type. But only one defense witness, Dr. Reinstein, unequivocally stated his opinion that the defendant was legally insane at the time of the offenses. Dr. Bogen's conclusion that defendant was then sane was based not only on his own examination of the defendant, but on defendant's actions on the day of the crime. In oral argument before this court defense counsel contended that Dr. Bogen's diagnosis was based on at least two false premises: that defendant was taking medication at the time of these offenses and that defendant fled the scene of the crime, thus showing an appreciation of the criminality of his conduct. In fact Dr. Bogen's conclusion that defendant's mental illness was in remission based on medication related only to the defendant's status at the time Dr. Bogen examined him, in October of 1984. In any event, there was contradictory evidence as to whether defendant was taking his medication at the time of the offenses. His mother testified that he was not doing so. But Dr. Reinstein had reported throughout the month of July that defendant was doing well under medication and that defendant had even commented on his need for continued medication. On July 3, less than two days before these incidents began, he had renewed the defendant's medication. Thus there was evidence from which a finder of fact could conclude that defendant was still taking that medication. There was also evidence in the record that defendant fled the scene of the fires; a neighbor testified that he saw defendant "cut out" after setting the porch afire. Dr. Bogen's opinion of the defendant's sanity was also supported by the police officials and the assistant State's Attorney who spoke to him in the hours after he set the fires. They re-

ported that he was coherent and normal in his behavior, initially denying commission of the offenses and then expressing remorse when he confessed to them.

Unlike the court in *Palmer,* we do not find that the testimony of the State's expert was incredible or not based on facts. It was within the discretion of the trial court to resolve the contradictions in the expert testimony presented to it. (*People v. Clark* (1981), 102 Ill. App. 3d 414, 429 N.E.2d 1255.) Under these circumstances we find no basis for disturbing the trial court's finding that defendant failed to establish his insanity by a preponderance of the evidence.

## II

■ Defendant also asserts that the guilty but mentally ill statute violates the due process and equal protection clauses of the United States and Illinois Constitutions. These identical contentions were considered and rejected by this court in *People v. Smith* (1984), 124 Ill. App. 3d 805, 465 N.E.2d 101. Defendant has not attempted to distinguish that case nor has he directly challenged its reasoning. Indeed, in his brief defendant has merely adopted, verbatim, the contentions on this issue as advanced by the defendant in *Smith.* Defendant has failed to even cite to this court any of the subsequent cases in which the constitutionality of this statutory scheme has been affirmed in the face of similar or identical challenges. (*People v. Carter* (1985), 135 Ill. App. 3d 403, 481 N.E.2d 1012; *People v. Boatright* (1985), 137 Ill. App. 3d 888, 486 N.E.2d 926; *People v. DeWit* (1984), 123 Ill. App. 3d 723, 463 N.E.2d 742.) We adhere to our previous determination of these contentions and therefore find no basis in these contentions for reversal of defendant's conviction.

## III

■ Defendant next contends that section 6—2(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e)), which gives defendants who raise the affirmative defense of insanity the burden of proving their insanity by a preponderance of the evidence, violates due process. Defendant apparently asserts that the issue of legal insanity bears such a direct relationship to the *mens rea* element of murder that defendant was in effect required to shoulder the burden of disproving this element.

Defendant correctly notes that under the holding of *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068, due process requires that the prosecution prove beyond a reasonable doubt every element of a crime in order to convict a

defendant of that crime. In *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881, this requirement was found to be violated by a Maine statute which required a defendant to prove by a preponderance of the evidence that he acted in the heat of passion in order to reduce murder to manslaughter. Because the proof of heat of passion negated a necessary element of murder, malice afore-thought, the court held that it violated due process to require the defendant to in effect negate this element.

Defendant contends that these holdings have undermined the continuing validity of *Leland v. Oregon* (1952), 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002. In that case the court upheld the validity of an Oregon statute requiring a defendant to prove the defense of insanity beyond a reasonable doubt. The court found no due process violation in this requirement, noting that Oregon still required the prosecution to prove beyond a reasonable doubt every element of the offense of murder. In *Mullaney* itself Justice Rehnquist, concurring in the opinion, stated that he found no inconsistency in the holdings of *Leland, Winship,* and *Mullaney.* He noted that although evidence relating to the legal defense of insanity might also be relevant to whether the requisite *mens rea* existed, the existence of one bore no necessary relationship to the existence of the other. Thus Oregon was not improperly shifting to the defendant the State's burden of proving all elements of the offense beyond a reasonable doubt. (*Mullaney,* 421 U.S. at 705-06, 44 L. Ed. 2d at 523-24, 95 S. Ct. at 1893.) The continuing validity of *Leland* has subsequently been established in *Rivera v. Delaware* (1976), 429 U.S. 877, 50 L. Ed. 2d 160, 97 S. Ct. 226. There the court dismissed as not presenting a substantial Federal question an appeal of a Delaware Supreme Court decision af-firming the validity of a Delaware law requiring defendants to prove claims of insanity by a preponderance of the evidence. The defendant in *Rivera* challenged the constitutionality of this law, asserting that *Leland* had been overruled by *Winship* and *Mullaney.* The court's dismissal of the appeal constituted a determination on the merits. (*Hicks v. Miranda* (1975), 422 U.S. 332, 45 L. Ed. 2d 223, 95 S. Ct. 2281.) Subsequently in *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, the court explicitly stated that it would not reconsider the holdings of *Leland* and *Rivera.* Based on these holdings we find no due process violation in the Illinois require-ment that a defendant establish, by a preponderance of the evidence, the affirmative defense of insanity. The Illinois statute requires an initial determination of whether the State has proved beyond a rea-sonable doubt all elements of the offenses charged. Only after such a

determination of guilt does the fact finder consider whether a defendant has proved by a preponderance of the evidence that he is not guilty by reason of insanity. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e).) Thus, the statute complies with the *Winship* requirement that the prosecution prove each element of an offense beyond a reasonable doubt.

## IV

■ The State concedes that defendant's sentence and conviction for aggravated arson must be reversed in the light of the supreme court's holding that the statute is unconstitutional. (*People v. Johnson* (1986), 114 Ill. 2d 69, 499 N.E.2d 470; *People v. Wick* (1985), 107 Ill. 2d 62, 481 N.E.2d 676.) However, the record establishes that the court also initially found defendant guilty of arson. At defendant's request the court first heard arguments on the issue of defendant's guilt as to murder, aggravated arson, and arson. The court found that defendant's guilt had been established as to all charges. After then considering the question of defendant's legal sanity at the time of these offenses, the court formally entered findings of guilty but mentally ill only as to murder and aggravated arson, explicitly noting that it would not enter a finding as to arson because that offense merged into the aggravated arson conviction. For that reason this cause must be remanded for sentencing on the offense of arson.

For the reasons set forth in this opinion we affirm defendant's conviction and sentence for murder, reverse his conviction and sentence for aggravated arson, and remand the cause for sentencing on the arson charge of which the court also found him guilty but mentally ill.

Affirmed in part; reversed and remanded in part.

SULLIVAN and MURRAY, JJ., concur.